UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRIEDRICH LU,                      )
    Plaintiff,                     )
                                  )
        v.                         )    C.A. No. 12-11117-MLW
                                    )
GEORGE HULME and TRUSTEES OF      )
THE BOSTON PUBLIC LIBRARY,        )
    Defendants                     )

MEMORANDUM AND ORDER

WOLF, D.J.                                        September 22, 2015


CONTENTS

I. SUMMARY..................................................... 1

II.  PROCEDURAL HISTORY........................................ 4

III.   SUMMARY JUDGMENT LEGAL STANDARD......................... 9

IV.  FACTS..................................................... 11

  A.  The Boston Public Library Appropriate Library Use Policy 12

  B.  The June 13, 2012 Incident ............................. 15

V.   ANALYSIS.................................................. 20

  A.  First Amendment Right .................................. 21

  B.  Equal Protection Claim ................................. 41

  C.  Procedural Due Process Claim ........................... 43

  D.  Massachusetts Civil Rights Act Claim ................... 45

VI.  CONTEMPT MOTION........................................... 47

VII.   ORDER................................................... 48

I. SUMMARY

Pro se plaintiff Friedrich Lu brings this civil rights

action against defendants George Hulme and the Trustees of the

Boston Public Library (the "Trustees") pursuant to Section 1983

1

of the Federal Civil Rights Act, 42 U.S.C. §1983, and §11I of the Massachusetts Civil Rights Act, Mass. G.L. c.12, §11I. Lu, who is a homeless person, alleges that his First and Fourteenth Amendment rights were violated when he was refused entrance to the Copley branch of the Boston Public Library (the "Library") with a wire shopping cart containing his belongings (the "cart").

The defendants have moved for summary judgment on all of Lu's claims. Lu opposes that motion. Lu has also filed a motion requesting that the court institute civil contempt proceedings against defense counsel for allegedly forging evidence.

The court is granting the defendants' Motion for Summary Judgment on all of Lu's claims. Lu has failed to produce sufficient evidence to allow a reasonable jury to find that the defendants violated any of his federal rights, as required to defeat a motion for summary judgment on a Section 1983 claim.

Lu has a First Amendment right to enter the Library to read and write, among other things. At the same time, the defendants have a substantial interest in preserving Library property and ensuring that all patrons can use the Library. The Library has a written policy that excludes foul-smelling articles that will impede the Library use of other patrons. The undisputed facts

2

in the record show that Lu was not permitted to bring his cart and its contents into the Library because a security guard determined that it was producing a strong offensive odor. Lu does not contest the guard's observation that the cart emitted a strong foul odor. The decision to exclude Lu from bringing his foul smelling cart into the Library was a narrowly-tailored restriction on Lu's right of access to the Library that served the Library's substantial interests in ensuring that the general public can use the facilities without interference by the conduct of others. Accordingly, preventing Lu from bringing his cart and its contents into the Library did not violate his First Amendment rights.

Other restrictions in the Library's written policy, such as the prohibition on wheeled devices, may present constitutional issues. However, in this case, the Library had a constitutionally valid reason to prevent Lu from bringing his cart and its contents into the Library. This is not an appropriate case in which to decide the constitutionality of those other restrictions.

Summary judgment is appropriate on Lu's remaining constitutional claims. Lu has not identified any similarly situated individual who was allowed Library access. Therefore, his equal protection claim fails as a matter of law. His

procedural due process claim fails as a matter of law because the defendants gave Lu notice, an opportunity to be heard, and explained the reasons for his exclusion from the Library.  Under the circumstances, these informal procedures satisfied the flexible requirements of due process.

The court is also granting summary judgment on Lu's Massachusetts Civil Rights Act ("MCRA") claim.  The MCRA, like Section 1983, requires proof that the defendants violated the plaintiff's statutory or constitutional right.  On the evidence in this case, a reasonable factfinder could not conclude that the defendants violated any of Lu's statutory or constitutional rights.

Finally, the court is denying Lu's Motion for a Civil Contempt Proceeding.  Lu's conclusory allegation that defense counsel forged the library's appropriate use policy is unsupported by any evidence and is not credible.

II. PROCEDURAL HISTORY[1]

On June 22, 2012, Lu filed a Verified Complaint and a Motion for a Temporary Restraining Order ("TRO") against the Trustees in their official capacity and Hulme in his official

---

[1] This section provides an overview of the relevant procedural history.  It omits the many motions for sanctions, discovery motions, and other miscellaneous motions that this court and magistrate judge have decided in the course of this case.

and individual capacities.  Lu alleged that the Library violated
his constitutional rights by refusing to allow him to bring his
cart and its contents into the Library.  The defendants filed a
Motion to Dismiss pursuant to Federal Rule of Civil Procedure
12(b)(6) and opposed the requested TRO.  The defendants argued
that Lu was prevented from entering the Library in accordance
with its Appropriate Library Use Policy, which they contended
was a constitutionally valid regulation of the Library.  Lu
opposed the motion to dismiss.

On March 30, 2013, the court issued a Memorandum and Order
that addressed, among other things, the Motion to Dismiss and
the Motion for a TRO.  See Lu v. Hulme, 12-cv-11117-MLW, 2013 WL
1331028 (D. Mass. March 30, 2013).  The court granted the
defendants' Motion to Dismiss as to Lu's claim that the Library
violated his right to substantive due process under the
Fourteenth Amendment and denied it with respect to Lu's
remaining claims.  The court found that Lu's complaint did not
state a substantive due process claim because he had failed to
allege facts that would permit a reasonable fact finder to
conclude that the defendants' actions were so egregious as to
"shock the conscience."  Id. at *8 (citing Gonzalez-Droz v.
Gonzales-Colon, 660 F.3d 1, 16 (1st Cir. 2011)).

The court found that Lu had, however, stated a plausible claim for violations of his rights under the First Amendment, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and the MCRA.   With respect to his First Amendment claim, the court explained that Lu had a First Amendment right to access the library.   Id. at *5.   The court observed that other courts disagreed over whether the library was a "designated public forum" or a "limited public forum" for First Amendment purposes, but found that it was unnecessary to decide which standard to apply.   Id.   Even assuming that Lu had been excluded in accordance with the written policy, the merits of Lu's First Amendment claim would depend on the reasonableness of the Library's policy.   Id. at *7.   The reasonableness of the policy "must be decided[] on an evidentiary record, on a motion for summary judgment or at trial, rather than on a motion to dismiss."   Id.

With respect to Lu's equal protection claim, the court found that Lu had plausibly alleged that he and other homeless individuals had been selectively excluded from the Library based on their status in order to inhibit the exercise of their First Amendment right to access the Library.   Id.   The court observed that Lu had arguably failed to provide sufficiently specific allegations of disparate treatment of similarly situated

individuals.  Id.  However, because he was representing himself and his complaint was required to be liberally construed, and because Lu's First Amendment claim was not being dismissed, the court concluded that the defendants would not be prejudiced by continued litigation of the corollary equal protection claim. Id.

The court next observed that the parties had not "adequately addressed the issue of whether a protected liberty interest is implicated or the proper framework for analyzing Lu's procedural due process claim."  Id. at *8.  Accordingly, the court denied the motion to dismiss Lu's procedural due process claim without prejudice.  Id.

The court found that Lu had stated a plausible claim for damages under the MCRA.  Id. (citing Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985)).  The court denied the TRO because Lu had not shown a substantial likelihood of success on the merits of any of his claims.  See id. at *10.

Finally, the court concluded that this was an exceptional case that justified the appointment of counsel for Lu.  Id. at *11 (citing 28 U.S.C. §1915(e)).  The court ordered Lu to report whether or not he requested counsel be appointed to represent him in this case.  Id.  On May 15, 2013, Lu reported that he did

not want appointed counsel and would continue to represent himself.

Subsequently, discovery disputes arose between the parties that were largely attributable to Lu's lack of legal training. In a March 3, 2014 Memorandum and Order, the court noted that, despite Lu's dedication to his case, these types of disputes were likely to continue to impede the case's progress if Lu proceeded pro se. Accordingly, the court again ordered Lu to report whether he consented to the court appointing him counsel to represent him in the case. Lu again declined appointed counsel.

The court held a scheduling conference on April 14, 2014. At the outset of the hearing, the court again offered, and Lu again refused to accept, a court-appointed lawyer

In the ensuing months, several additional discovery disputes arose, some of which were referred to a magistrate judge and others of which were addressed by the court. The court held a scheduling conference on February 26, 2015. The parties told the court that there had been minimal discovery, although they had conducted Lu's deposition. The court then established a schedule for the submissions of any motions for summary judgment.

On April 3, 2015, the defendants moved for summary judgment on both counts of Lu's complaint.   They argued that Lu was excluded because his shopping cart was full of foul-smelling articles, in accordance with the written Library Policy.   They further argue that, even if the library violated Lu's constitutional rights, defendant Hulme is protected from liability by qualified immunity.

Lu opposes the motion for summary judgment.   His sole argument is that the Library Policy was forged by defense counsel for the purposes of this litigation.

Lu has also filed a motion requesting that the court institute civil contempt proceedings against defense counsel to determine whether they forged the Library Policy.   The defendants have opposed that motion.

III.   SUMMARY JUDGMENT LEGAL STANDARD

Because Lu is proceeding pro se, his pleadings and filings must be "liberally construed."   See Erickson v. Pardus, 551 U.S. 89, 94 (2007).   "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.  R.  Civ.  P.  56(a).    Summary  judgment  is,  therefore, appropriate only if there exists no factual dispute that is both

"material" and "genuine."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A fact is "material" if, in light of the relevant substantive law, "it has the potential of determining the outcome of the litigation." Martinez-Rodriguez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010) (quoting Maymi v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008)).  "Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." Liberty Lobby, 477 U.S. at 248.

To determine if a factual dispute is "genuine," the court must assess whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Chadwick v. WellPoint, Inc., 561 F.3d 38, 43 (1st Cir. 2009) (quoting Liberty Lobby, 477 U.S. at 248) (internal quotation marks omitted); Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009).  In making this determination, the court must "constru[e] the record in the light most favorable to the non-moving party." Douglas v. York Cnty., 433 F.3d 143, 149 (1st Cir. 2005); accord Montalvo v. Gonzalez-Amparo, 587 F.3d 43, 46 (1st Cir. 2009).  However, "evidence from the moving party as to specific facts can be accepted by the court where no contrary evidence is tendered by the party opposing summary judgment."

Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010) (citing LaFrenier v. Kinirey, 550 F.3d 166, 167 (1st Cir. 2008)).

Evidence submitted in inadmissible form may be considered only if it could, at trial, be presented in admissible form. See Fed. R. Civ. P. 56(c)(2); Gorski, 290 F.3d at 475-76; Vazquez, 134 F.3d at 33.

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, the moving party's burden "may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The record should not be scrutinized piecemeal, but rather must be "taken as a whole." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

IV.  FACTS

The evidence submitted to the court in connection with the summary judgment motion consists of four sources: Lu's Verified

11

Complaint;[2] Lu's deposition;[3] Hulme's affidavit; and the Library

Policy.  With one exception noted below, the facts surrounding

Lu's exclusion from the Library are undisputed.

A.   The Boston Public Library Appropriate Library Use
     Policy

The Library is a branch of the Boston Public Library system

(the "BPL").  In 2001, the BPL adopted an Appropriate Patron

Behavior Policy.  On March 23, 2004, it replaced that policy

with the Library Policy, which is still in effect.  See Boston

Public Library Appropriate Use Policy (Docket No. 63-2) (the

"Library Policy").[4]

The Library Policy provides, in pertinent part:

> The Boston Public Library is supported by the taxes of
> the people of Boston and the Commonwealth of
> Massachusetts who expect each of our facilities to be
> clean, comfortable, and safe places for selecting
> materials, reading, researching, studying, writing,
> and attending Library or community sponsored programs
> and meetings. To this end, the Library is responsible
> for establishing rules of conduct to protect the
> rights and safety of Library patrons, volunteers, and
> staff, and for preserving and protecting the Library's
> materials, equipment, facilities, and grounds.

---

[2] Verified Complaints are treated as affidavits for summary
judgment purposes.  See Sheinkopf v. Stone, 927 F.2d 1259, 1262
(1st Cir. 1991).

[3] Lu's deposition was not under oath because he did not present a
valid identification to the stenographer.  However, the
defendants have agreed to treat it as a deposition under oath.

[4]   The Library Policy is available at:
http://www.bpl.org/general/policies/acceptableuse.htm.

. . . .

Enforcement of these rules will be conducted in a fair and reasonable manner. Library staff and/or security staff will intervene to stop prohibited activities and behaviors. Failure to comply with the Library's established rules, regulations, and policies could result in removal from the premises and expulsion from the Library for a period of one day to one year, or in arrest or prosecution. Violations could also result in the restriction and/or termination of Library privileges, including the use of Library computers and other equipment. Expulsion for more than one week may be appealed in writing to the Director of Public Services.

**For the comfort and safety of patrons, volunteers, and staff, and the protection of Library property, the following actions are examples of conduct not allowed on Library property.**

- Engaging in any activity in violation of Federal, State, local or other applicable law, or Library policy.

  . . . .

- Bringing in garbage, articles with a foul odor, or articles which, alone or in their aggregate, impede the use of the library by other users.

- Using wheeled devices in Library property or on Library grounds, except in designated areas, including skateboarding, roller-skating, bicycling, scooters, and shopping carts (exceptions i.e. wheelchairs, walkers, and strollers).

  . . . .

All bags and other articles are subject to inspection by security and other authorized personnel. The Library reserves the right to limit the size and number of items brought into the Library.

**Date Approved: March 23, 2004** <u>Supercedes: Appropriate</u>
<u>Patron Behavior Policy adopted January 2001.</u>

<u>See</u> <u>id.</u> (underline and bold in original).

Lu attacks the Library Policy in two ways.   He first
alleges that the copy of the policy submitted by the defendants
is not authenticated.   He contends that it is, therefore, not
admissible evidence.   Accordingly, he maintains that the policy
cannot be considered by the court in deciding the summary
judgment motion.   However, the court is not limited to
considering only admissible evidence at summary judgment.   A
court may consider any material that can be "presented in a form
that would be admissible in evidence."   <u>See</u> Fed. R. Civ. P.
56(c)(2).

Lu alleges that the Library Policy was forged for the
purposes of the litigation.   However, he provides no evidence to
support that allegation.   The Library Policy states that it has
been in effect since March 2004.   <u>See</u> Library Policy ("**Date
Approved: March 23, 2004** <u>Supercedes: Appropriate Patron Behavior</u>
<u>Policy adopted January 2001.</u>") (underline and bold in original).
At trial, the defendants could provide an authenticated copy of
the Library Policy in order to present the Policy in admissible
form.   Hulme's affidavit states that the policy was in effect
when Lu was refused entry to the Library.   <u>See</u> Hulme Affidavit

14

¶¶3, 7 (Docket No. 63-4).   Lu's conclusory allegations of forgery are insufficient to create a material factual dispute as to whether the Library Policy was in force on June 13, 2012.[5] Accordingly, the court is considering the Library Policy in deciding the motion for summary judgment.

### B.   The June 13, 2012 Incident

Plaintiff Friedrich Lu is a homeless man who lives in Boston.   See Statement of Friedrich Lu at 6-7 ("Lu Deposition") (Docket No. 63-3).   In early 2012, he made extensive use of the Library.   He would visit the Library every weekday and stay there from approximately 9:00 a.m. until 4:30 or 5:00 p.m.   Id. at 9-10.   Often, he would return to the library from 6:15 p.m. until 8:30 p.m.   Id. at 10.

Shortly after 9:00 a.m. on June 13, 2012, Lu sought to enter the Library through its main entrance on Boylston Street. See Verified Compl. ¶7(a).   It was raining.   Id. ¶7(b).   Lu was pulling a loaded shopping cart with his right hand and carrying three white plastic grocery bags in his left hand.   See id. ¶7(a).

---

[5] In his complaint, Lu cites a newspaper article from 2008 that discusses the Library Policy.   See Verified Complaint ¶5 (citing Ric Kahn, Free to All, Boston Globe, June 15, 2008, available at http://www.boston.com/ae/books/articles/2008/06/15/free_to_all/?page=full).

The shopping cart had two small wheels and was approximately one-and-a-half feet long, one foot wide, and three feet tall. Id. ¶7(a)(i). For at least the preceding two months, Lu had taken the cart nearly everywhere that he went. See Lu Depo. at 11-12, 17. The sole exception was that he would leave it outside of the homeless shelters where he stayed. Id. at 12. When he left the cart outside, he would take certain important belongings out of the cart and into the shelter with him. Id. at 12.

On the morning of June 13, 2012, Lu's shopping cart was "full to the brim." See Lu Depo. At 12. The cart contained approximately ten white plastic grocery bags piled on top of each other and two brown paper grocery bags on top of those. See id. at 12-13. The brown paper bags were mostly empty, but may have contained some legal documents. Id. at 14. The cart contained approximately five bottles or cans, including Lu's water bottle. Id. at 15-16. There was also a piece of clothing on top of the cart. Id. at 13. The sole food item in the cart was a recently purchased package of ice cream. Id. at 14-15. The items at the top of the cart were wet from the rain. Id. at 16-17.

With his cart and bags in tow, Lu walked through the Library's main entrance toward the Library's turnstiles. Id. at

18-19. There was a desk on either side of the entrance. <u>Id.</u> A male and female security guard were on duty at one of the desks. <u>Id.</u> at 19-20.

Over the preceding two months, Lu had seen these two guards several times. <u>Id.</u> at 20. On these prior occasions, they had allowed him to remain in the Library with his cart and its contents. <u>Id.</u> at 20. Approximately a week before this incident, the male security guard had discovered Lu in the Library basement with his cart. <u>Id.</u> On that occasion, the guard told him that no trash was allowed in the Library. <u>Id.</u> However, when Lu showed him the articles in the cart, the guard agreed that they were not trash. <u>Id.</u> The guard allowed Lu to remain in the Library with his cart. <u>Id.</u>

However, on June 13, 2012, the male security guard asked Lu to stop after he entered the main Library entrance. <u>Id.</u> at 19. He told Lu that he could not enter the Library with his cart and its contents. <u>Id.</u> The security guard informed Lu that he could leave the cart outside of the Library, where it would remain unguarded. <u>Id.</u> The guard further informed Lu that the police would be called if he tried to enter with the cart. <u>Id.</u> at 20.

Lu asked to speak with the guards' supervisor. <u>Id.</u> at 21. Hulme, the supervisor, was the Manager of Security for BPL. <u>See</u>

17

Hulme Affidavit ¶2.  As Manager of Security, his duties included ensuring the enforcement of the Library Policy.  Id. ¶3.

Without having seen the cart, Hulme told the male security guard over the radio that Lu could not come in with it.  See Verified Complaint ¶7(d).  Lu asked to speak with Hulme in person.  Id.  Hulme came to the desk with two other men.  Id.

Upon arrival, Hulme immediately reaffirmed that Lu could not enter the Library with his cart.  Id. ¶7(e).  He then asked Lu whether he had brought the cart into the Library in the past. Id.  Lu replied that he had.  Id.  Hulme informed Lu that the cart's contents were "all trash."  Id.  Lu asked what he meant by trash, and Hulme pointed to an empty bottle in the cart.  Id. Lu offered to leave the bottle outside, but Hulme replied that everything in the cart was trash.  Id.

Lu explained that he was homeless and had to carry all of his belongings with him.  Id.  Hulme inquired further about what was in the cart.  Id.  Lu explained that he had some legal papers.  Id.

Lu then asked how he could rearrange his belongings to be able to bring them into the Library.  Id.  Hulme responded that it was impossible.  Id.  He explained that other homeless people were not permitted into the Library with their belongings.  Id. Hulme told Lu that he had previously allowed a homeless person

18

into the Library because he put all of his belongings into
suitcases.  Id.  Lu explained that it would be impossible for
him to find suitcases.  Id.  Lu was asked to leave, and he did.
Id.

Lu was in the Library for approximately ten minutes that
morning.  Lu Depo. at 23.  The conversation between Lu and Hulme
lasted approximately five minutes.  Id.  Lu felt that Hulme was
a "good natured person" and that their interaction was not
hostile.  Id.

Hulme's recollection of this event is largely similar to
Lu's.  He agrees that the encounter was "friendly and not
hostile."  See Hulme Aff. ¶¶4-11.  Hulme adds that the male
security guard informed him that he initially stopped Lu because
he believed that the items in Lu's carts were "stinky."  Id. ¶5.
Hulme agreed, observing "a pungent odor that seemed to be coming
from" the cart.  Id. ¶6.  He states that he "had heard that
several patrons had complained about an offensive odor
associated with Mr. Lu in the past."  Id. ¶11.  Lu has not
addressed whether his cart was emitting any odor, and,
therefore, the evidence that it smelled bad is undisputed.

The only difference between Lu's and Hulme's accounts of
the conversation on June 13, 2012, concerns whether the Library
Policy was mentioned.  Hulme claims that he informed Lu that he

19

could not bring his cart and its contents into the Library because it would violate Library Policy.  See Hulme Aff. ¶8.  Lu claims that he was not aware of any policy regulating Library access.  Verified Complaint ¶11.  At the summary judgment stage, the court must accept Lu's contention as true.

Lu has not tried to return to the Library since June 13, 2012.  See Lu Depo. at 24.  Nobody has ever told him that he cannot use the Library as long as he does not bring his cart. Id.  Lu understands that he can use the Library like other members of the public.  Id. at 34-35.

V.  ANALYSIS

Lu's Complaint asserts two claims for relief.  His first claim is brought pursuant to 42 U.S.C. §1983.  Section 1983 provides a remedy for violations of federal statutory and constitutional rights committed under color of state law.  Lu's second claim is brought under the under the analogous MCRA, M.G.L. c. 12, §11I.

Both Section 1983 and the MCRA require a plaintiff to prove that the defendants violated his statutory or constitutional right.  See 42 U.S.C. §1983; M.G.L. c. 12, §11I.  Lu asserts that three of his constitutional rights were violated when he was not permitted to enter the Library with his belongings: his First Amendment right to receive information, his Fourteenth

20

Amendment right to equal protection of the laws, and his Fourteenth Amendment right to due process of law.

For the reasons explained below, the court finds that, based on the undisputed facts, a reasonable factfinder could not conclude that the defendants violated Lu's constitutional rights. Accordingly, the court is granting summary judgment for the defendants on both Lu's Section 1983 and MCRA claims.

A.   First Amendment Right

1.   The Library is a Designated Public Forum

The First Amendment "protects the right to receive information and ideas." Stanley v. Georgia, 394 U.S. 557, 564 (1969). The right to receive information "includes the right to some level of access to a public library, the quintessential locus of the receipt of information." Neinast v. Board of Trustees of Columbus Metropolitan Library, 346 F.3d 585, 591 (6th Cir. 2003) (quoting Kreimer v. Bureau of Police for the Town of Morristown, 958 F.2d 1242, 1255 (3d Cir. 1992)); see also Doe v. City of Albuquerque, 667 F.3d 1111, 1119-20 (10th Cir. 2012).

However, public libraries are public property. "'The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending upon the character of the property at

21

issue,' for the First Amendment requires neither equal nor unlimited access to public places." <u>Kreimer</u>, 958 F.2d at 1255 (quoting <u>Perry Education Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 44 (1983)).

Beginning in <u>Perry Education Association</u>, the Supreme Court has developed the "forum" analysis for analyzing restrictions on speech on government property.   Forum analysis separates government property into three categories of forums to help courts evaluate whether a given restriction on speech on government property runs afoul of the First Amendment.

The traditional public forum consists of "places which by long tradition or by government fiat have been devoted to assembly and debate . . . ." <u>Perry Education Ass'n</u>, 460 U.S. at 45.   Examples of traditional public forums include streets, parks, and public sidewalks.  <u>Id.</u>   In a traditional public forum, content-based government regulations are permissible only where "necessary to serve a compelling state interest and . . . narrowly drawn to serve that end." <u>Id.</u>   Content-neutral time, place, or manner restrictions are permissible if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." <u>Id.</u>

The designated public forum consists of "public property which the state has opened for use by the public as a place for expressive activity." Id. In order to create a designated public forum, the government must "intentionally open[] up" property to serve as a public forum. Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 469 (2009). Courts must look to the government actor's "actually expressed intention," as well as its actual practice, in order to determine whether the government intended to designate a place as a public forum. American Freedom Defense Initiative v. Mass. Bay Transp. Authority, 781 F.3d 571, 578-79 (1st Cir. 2015) (citing Ridley v. Mass. Bay Transp. Authority, 390 F.3d 65, 76 n.3 (1st Cir. 2004)). "Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." Summum, 555 U.S. at 469-70.

The limited or nonpublic forum is created when the government opens its property only to use by certain groups or for the discussion of certain subjects. See Christian Legal Soc. Chapter of the University of California, Hasting College of the Law v. Martinez, 561 U.S. 661, 679 n. 11 (2010) (quoting Summum, 555 U.S. at 469). "Recognizing a State's right 'to preserve the property under its control for the use to which it

23

is lawfully dedicated,' [t]he Court has permitted restrictions on access to a limited public forum . . . with this key caveat: Any access barrier must be reasonable and viewpoint neutral." Id. at 679 (internal citation omitted) (quoting Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 800 (1985)); see also Perry, 460 U.S. at 46.

Many courts have concluded that a public library is a designated public forum.[6]  See Doe, 667 F.3d at 1130; Kreimer, 958 F.2d at 1259-61; Neinast, 346 F.3d at 591. As the Tenth Circuit has explained:

> As Perry counsels, a designated public forum is "public property which the State has opened for use by the public as a place for expressive activity." 460 U.S. at 45.  Public libraries are opened for

---

[6] In deciding the Motion to Dismiss, the court observed that other courts had disagreed over whether libraries were limited or designated public forums. See Lu, 2013 WL 12331028 at *5 n.1. However, as the Tenth Circuit has explained, courts had deemed libraries to be limited public forums had used that term to mean a subcategory of the designated public forum. See Doe, 667 F.3d at 1130 ("Although many of these courts used the term 'limited public forum,' they each applied the standard applicable to designated public fora in reviewing regulations that restricted permitted expressive activity (reading, writing, and quiet contemplation) in the library.") (emphasis in original).  In 2004, the First Circuit surveyed its varying use of the term "limited public forum" as synonymous with both "designated public forum" and "nonpublic forum," and adopted the "usage equating limited public forum with non-public forum . . . ." Ridley, 390 F.3d at 76 n.3 (1st Cir. 2004).  It was not until 2010 that the Supreme Court made clear that limited public forums were not designated public forums. See Martinez, 561 U.S. at 679 n. 11.

> particular forms of expressive activity, including receiving information and "reading, writing or quiet contemplation." <u>Kreimer</u>, 958 F.2d at 1264. While public libraries are not designated for other First Amendment activities, such as speeches or debate, this limitation on the types of First Amendment activity permitted does not preclude a library from constituting a designated public forum.

<u>Doe</u>, 667 F.3d at 1128-29.

The court finds that the Library is a designated public forum.[7] The Library Policy provides that the Library is publicly funded and designated to provide a place for "selecting materials, reading, researching, studying, writing, and attending Library or community sponsored programs and meetings." The City of Boston has thus opened its property to the general public for "particular forms of expressive activity." <u>Doe</u> 667 F.3d at 1128. By intentionally opening the Library up for the exercise of the First Amendment right to access information, the City has created a designated public forum. <u>See</u> <u>Perry Education Ass'n</u>, 460 U.S. at 45.[8]

---

[7] The defendants seem to assume, without discussion, that the Library is a designated public forum. <u>See</u> Mem. of Law in Support of Motion for Summary Judgment at 8-9. However, the analysis that they go on to perform conflates the heightened scrutiny of restrictions in designated public forums with the "reasonableness" review conducted of regulations restricting speech in limited public forums. <u>See</u> <u>id.</u> at 9.

[8] The Library does not limit admission to specific groups, and does not limit First Amendment activities based on content. It

25

However, unlike the classic designated public forum, the City did not intend the Library to be used for the exercise of all forms of First Amendment rights.   Rather, the City opened Library to facilitate the specific types of activities for which libraries are well-suited.   See Library Policy (The Library is intended to provide a place for "selecting materials, reading, researching, studying, writing, and attending Library or community sponsored programs and meetings.")   The Library is, therefore, not required to permit the full range of expressive conduct that is available in other types of public forums.   See Doe, 667 F.3d at 1128-29.   Instead, "the Library 'is obligated only to permit the public to exercise rights that are consistent with the nature of the Library and consistent with the government's intent in designated the Library as a public forum.'"   Neinast, 346 F.3d at 591 (quoting Kreimer, 958 F.2d at 1262)).[9]

_____

is, therefore, not a limited public forum.   See Martinez, 561 U.S. at 679 n. 11.

[9]   Some courts have created an additional type of forum for describing public libraries, the "limited designated public forum."   See Kreimer, 958 F.2d at 1263 n. 25.   This term is appealing because it describes the fact that libraries are open to the public and do not regulate speech based on content, while accounting for the fact that the purposes of a Library are inconsistent with most forms of First Amendment expressive activity.   However, this fourth category of government forum has contributed to the confusion of forum terminology discussed

2. <u>Heightened Scrutiny Applies to the Challenged Restrictions</u>

In a designated public forum, the government may impose content-neutral time, place, and manner restrictions on expression so long as they are (1) narrowly tailored, (2) serve a substantial governmental interest, and (3) leave open adequate alternative channels of communication. <u>See</u> <u>New England Regional Council of Carpenters v. Kinton</u>, 284 F.3d 9, 20 (1st Cir. 2002). However, "restrictions that do not limit those First Amendment activities the government has specifically permitted in the designated public forum need only be" reasonable and viewpoint neutral. <u>Kreimer</u>, 958 F.2d at 1262 (citing <u>United States v. Kokinda</u>, 497 U.S. 720, 730 (1990)); <u>Perry</u>, 460 U.S. at 46 ("[T]he state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech

above. <u>See</u> <u>supra</u> n. 6; <u>see also</u> <u>Gilles v. Blanchard</u>, 477 F.3d 466, 474 (7th Cir. 2007) (explaining that some courts have "confusingly" adopted the term "limited designated public forum" to distinguish the "true [designated] forum"). The First Circuit has never recognized "limited designated public forum" as a distinct category for forum analysis, and this court will not do so. <u>Cf.</u> <u>Gilles</u>, 477 F.3d at 474 ("We doubt the utility of multiplying categories in this fashion, thus adding epicycles to an already complex scheme and turning the search for sensible results into a classification game. . . . To call the library lawn therefore a 'limited designated public forum' is an unnecessary flourish.'"). The distinction between "conduct" and "hygiene" or "appearance" regulations discussed below serves the same analytical purpose as the "limited designated public forum" category.

is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."). The government bears the burden of proof in this inquiry. See United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 815 (2000).

Courts have adapted the foregoing framework to public libraries by distinguishing between "hygiene" or "appearance" rules, and "conduct" rules. See Armstrong v. District of Columbia Public Library, 154 F. Supp. 2d 67 (D.D.C. 2001). Hygiene rules deny potential patrons access to a library based on their appearance or some other personal characteristic, without regard to their intended use of the Library. See id.; Kreimer, 958 F.2d at 1263-64. The quintessential example of a hygiene rule is a rule that permits removal of library patrons whose body odor is likely to bother other patrons. These rules "directly limit[]" a patron's exercise of the First Amendment rights for which a library is designated. They are, therefore, analyzed under the heightened scrutiny reserved for time, place, and manner restrictions. See Armstrong, 154 F. Supp. 2d at 75 ("The regulation at issue here allows for the denial of library access based on a patron's personal appearance. Since the effect of such a regulation is to prevent certain patrons from engaging in any conduct within, or use of, the library,

28

protected First Amendment activities such as reading, writing and quiet reflection are directly limited."); _see also_ _Kreimer_, 958 F.2d at 1263.

Conduct rules allow removal of patrons who misuse library facilities.  These rules do not implicate the same First Amendment concerns as hygiene rules because they only prohibit conduct that goes beyond the First Amendment purposes to which a public library is dedicated.  Examples of conduct rules in libraries include rules allowing removal of patrons who are not "engaged in reading, studying, or using library materials," and rules allowing removal of those who are harassing other patrons or staff.  _See_ _Kreimer_, 958 F.2d at 1262.  In addition, the Sixth Circuit has found that a rule requiring library patrons to wear shoes was a conduct rule because it "does not directly impact the right to receive information." _Neinast_, 346 F.3d at 591-92.[10]  Because conduct rules only prohibit "activities beyond the purpose for which the Library was opened," they are subject to review for reasonableness.  _Kreimer_, 958 F.2d at 1262.

---

[10] In _Neinast_, the Sixth Circuit decided without discussion that a rule requiring patrons to wear shoes should be examined only for reasonableness.  It is unclear how a rule allowing removal of a patron who is reading quietly in the Library does not directly impact his right to read in the library.  In any event, the court went on to conclude that the shoe wearing policy survived the heightened scrutiny applicable to time, place, and manner restrictions. _See_ _Neinast_, 346 F.3d at 592.

The Library relies on two rules to justify its decision to exclude Lu's cart on June 13, 2012. The first rule prohibits bringing in "garbage" or "articles with a foul odor." The second rule prohibits the use of wheeled devices, including shopping carts, on Library grounds.

On the one hand, these rules are content-neutral and restrict the "manner" in which patrons may exercise their First Amendment right to receive information. See Kreimer, 958 F.2d at 1264. The rules exclude patrons regardless of their intended use of the Library if they attempt to enter with carts or foul smelling articles. For a homeless person like Lu, who has to carry all of his possessions with him or risk them being stolen, see Verified Complaint ¶7(e), these prohibitions are analogous to a hygiene restriction. Hygiene restrictions, in effect, tell an individual that he cannot enter the Library without regard to his intended use of the Library. Offering only an unfeasible option concerning a cart does the same.

On the other hand, these rules do not necessarily limit patrons from using the Library for its designated First Amendment purposes. See Neinast, 346 F.3d at 592. If the patron leaves his cart or foul-smelling articles outside, he is free to use the Library. Therefore, these rules could be also

viewed as regulating conduct unrelated to the Library's First Amendment purposes.

The court finds that the heightened scrutiny applicable to time, place, and manner restrictions should be applied to the Library rules at issue here.[11]  For Lu, leaving the cart outside meant risking theft or destruction of all of his possessions. The Library Policy, therefore, forced Lu to choose between exercising his First Amendment right of access and the security of all of his property.  This constitutes a substantial burden on Lu's access to the Library.  This substantial burden was imposed without regard to Lu's intended use of the Library. "Because [the challenged Library rules] require the expulsion of a patron who might otherwise be peacefully engaged in permissible First Amendment activities within the purposes for which the Library was opened, such as reading, writing or quiet contemplation, [the court] must determine whether the rule is narrowly tailored to serve a significant government interest and whether it leaves ample alternative channels of communication." Kreimer, 958 F.2d at 1263.

---

[11]  The defendants' agree that the regulations at issue are "[c]ontent neutral time, place, and manner restrictions."  See Def. Mem. in Support. at 8.  However, they then state that library regulations are "generally reviewed under a reasonableness standard," and go on to apply that standard.  Id. at 9.

3.   <u>Analysis</u>

The Library policies that served as the basis for excluding

Lu prohibited:

- Bringing in garbage, articles with a foul odor,
  or articles which, alone or in their aggregate,
  impede the use of the library by other users.

- Using wheeled devices in Library property or on
  Library grounds, except in designated areas,
  including     skateboarding,     roller-skating,
  bicycling,     scooters,     and     shopping     carts
  (exceptions  i.e.  wheelchairs,  walkers,  and
  strollers).

<u>See</u> Library Policy.   The undisputed summary judgment record

establishes that Lu was excluded primarily, if not solely,

because the items in his cart were deemed foul-smelling garbage

by Hulme and the male security guard.   <u>See</u> Hulme Aff. ¶¶5-6;

Verified Compl. ¶7(e).

The Library has a substantial interest in ensuring that it

provides a "clean, comfortable, and safe place[] for selecting

materials,   reading,   researching,   studying,   writing,   and

attending Library or community sponsored programs and meetings."

Library Policy; <u>see also</u> <u>Kreimer</u>, 958 F.2d at 1264.   The court

must determine whether the law is narrowly tailored to serve

that interest, and whether it leaves open adequate channels for

excluded patrons to exercise their right to receive information.

<u>See</u> <u>Kinton</u>, 284 F.3d at 20.

32

The "narrowly tailored" requirement does not signify that a rule must be the "least-restrictive or least-intrusive means" of furthering the government's interest. Ward v. Rock Against Racism, 491 U.S. at 798. "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Id. at 799.

### a.   Foul Odor Prohibition

The court finds that the foul odor prohibition is constitutional, both as written and as-applied to Lu in this case. The prohibition on bringing in "articles with a foul odor which . . . impede use of the library by others" is narrowly tailored to serve the Library's substantial interest in ensuring that all patrons can use the Library for its designated purposes. The rule allows the Library to deny a patron entry only if a Library employee determines that the articles that they are bringing smell so bad that they will impede Library use. The Library's goal is served by excluding such foul-smelling articles "as this rule prohibits one patron from unreasonably interfering with other patrons' use and enjoyment of the Library; it further promotes the Library's interest in maintaining its facilities in a sanitary and attractive condition." Kreimer, 958 F.2d at 1264.

33

The foul-odor prohibition also leaves open ample alternative channels for Lu to receive information. As long as the patron leaves the garbage and foul smelling articles outside, he may use the Library facilities. Id. While it is no doubt burdensome for Lu to leave his cart outside, he is able to do it to enter homeless shelters. See Lu Aff. at 12.

The court also finds that the foul-odor prohibition is not unconstitutionally vague. "In prohibiting overly vague laws, the [vagueness] doctrine seeks to ensure that persons of ordinary intelligence have 'fair warning' of what a law prohibits, prevent 'arbitrary and discriminatory enforcement' of laws by requiring that they 'provide explicit standards for those who apply them,' and, in cases where the 'statute abut(s) upon sensitive areas of basic First Amendment freedoms,' avoid chilling the exercise of First Amendment rights." Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 62 (1st Cir. 2011) (alteration in original) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108-09)). However, "not all vagueness rises to the level of constitutional concern." Id. "[A] statute is unconstitutionally vague only if it 'prohibits . . . an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of

application.'"   Id. (quoting United States v. Councilman, 418
F.3d 67, 84 (1st Cir. 2005) (en banc)).

The prohibition on garbage and articles emitting a foul
odor necessarily confers some discretion on Library employees.
However, the Library Policy narrows that discretion, allowing
removal only if the garbage or foul smelling articles impede
Library use.  This criterion creates a standard for determining
what is prohibited, and provides notice of the standard.   This
renders the restriction sufficiently definite.  See id.; compare
Kreimer, 958 F.2d at 1268 (library prohibition of foul odors
that rise to the level of "nuisance" is sufficiently objective
to survive vagueness challenge), with Armstrong, 154 F. Supp. 2d
at 77-78 (library prohibition of people with "objectionable
appearance" such as "body odor" was unconstitutionally vague).

In view of the foregoing, the court finds that the
Library's prohibition of garbage and foul-smelling articles that
impede Library use is constitutional as written.

The court also finds that, based on the undisputed facts,
the restriction was constitutionally applied to prevent Lu from
entering the Library.  Defendant Hulme stated that the security
guard told him that the contents were "stinky."  Hulme Aff. ¶5.
Hulme perceived the contents of the cart to be "rubbish" and
smelled "a pungent odor that seemed to be coming from" the cart.

Hulme Aff. ¶¶6-7.  He says that he explained to Lu that the Library Policy forbade him from bringing his items inside because they were "rubbish" and "had a strong odor."  Id. ¶8. Lu admits that the contents of his cart were wet, Lu Depo. at 16-17; that he had the same contents in his cart for two months, id. at 20; and that he had stored his cart outside every night during this time, id. at 17.  These facts are consistent with Hulme's observation that the cart emitted a strong foul odor.

Lu states that he asked Hulme how he could rearrange his belongings to be able to come into the Library.  See Verified Compl. ¶7(e).  He also offered to leave one of the plastic bottles outside.  Id.  However, Lu then reiterated that he wanted to bring the cart and its contents into the Library.  Id. Given Hulme's determination that the cart's contents were mostly trash and were emitting a foul odor, leaving a bottle outside or reorganizing the cart would not have made the cart admissible under the Library Policy.

Lu does not provide any evidence concerning how his cart smelled.  Nor does he contest Hulme's determination that the cart's contents smelled bad.  Therefore, it is not disputed that the cart emitted a strong foul odor.  Accordingly, the court finds as a matter of law that the defendants were

36

authorized to exclude Lu's cart and its contents under the Library Policy.

The court recognizes that a rule prohibiting patrons from bringing articles into the Library may disproportionately affect homeless people.   However, the First Amendment protects the right of library access for everyone.   The Library has sought to protect access for all by adopting rules that prevent patrons from interfering with each other's use and enjoyment of the facilities.   Lu's "right has no lesser, or greater, significance than that of other residents.   Accordingly, his right to reasonable access to the Library cannot be expanded to such an extent that it denies others the same guarantee." Kreimer, 958 F.2d at 1265.

Because the defendants had a constitutionally legitimate basis for excluding Lu's cart and its contents from the Library on June 13, 2012, Lu's First Amendment rights were not violated when he was refused admission to the Library with his cart and its contents.   Therefore, summary judgment is appropriate on Lu's First Amendment claim.

### b.   Wheeled Device Prohibition

The record establishes that the primary, if not sole, reason for not allowing Lu into the Library was the security guard's observation that his cart contained trash that smelled

37

bad. See Hulme Aff. ¶¶5-8. The court has already determined that there was a constitutional basis for excluding the cart under the foul-smelling articles prohibition. On the facts of this case, it would be impossible to determine whether Lu would have been allowed to enter the Library with his cart if it did not contain foul-smelling articles. Therefore, this case does not provide an appropriate opportunity to decide the constitutional validity of the Library's prohibition on wheeled devices. See Sony BMG Music Entertainment v. Tenenbaum, 660 F.3d 487, 511 (1st Cir. 2011) ("It is bedrock that the 'long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.'" (quoting Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988))).

However, this is the first case in the First Circuit to consider the First Amendment implications of library-access restrictions. In addition, no other case has involved library policies prohibiting patrons from bringing items into the Library with them. It may be helpful to provide the following observations to future litigants and to libraries seeking to develop constitutional policies regulating library use.

As explained earlier, the Library has a substantial interest in prohibiting patrons from interfering with each

38

other's use of its facilities and in maintaining the Library as a cleanly and attractive place for patrons. The defendants argue that the prohibition on wheeled carts prevents interference with patrons' use of libraries by taking up space and blocking passage ways. However, the prohibition as stated in the Library Policy may pose constitutional problems.

First, the Library Policy's wheeled-device prohibition may not be narrowly focused on excluding devices with the potential to disrupt Library use. Unlike the restriction on foul-smelling articles, the prohibition on wheeled devices is written without reference to any adverse effect on Library use. The restriction excludes the use of all shopping carts for any purpose in the Library, regardless of their size, use, or potential for disrupting the Library. If the wheeled-device prohibition excludes substantially more individuals from the Library than necessary to serve the Library's substantial interests, it would not be "narrowly tailored." See McCullen v. Coakley, 571 F.3d 167, 178 (1st Cir. 2009).

Second, allowing exceptions to the wheeled-device policy could undercut a library's claim that it serves a legitimate interest. For example, in this case, the Library argues that shopping carts are prohibited because they "could interfere with patrons' use of busy libraries by taking up space and blocking

passageways." <u>See</u> Def. Mem. in Support at 9. However, strollers are permitted in the Library as an exception to the wheeled-device prohibition, even though they may be substantially larger and less easily stowed under a library table than other wheeled devices that the Policy forbids. In this case, for example, Lu's two-wheeled shopping cart was one-and-a-half feet long, one foot wide, and three feet tall, which is smaller than a stroller. Distinguishing between wheeled devices of the same size may weaken a library's argument that the policy furthers a substantial interest.

Finally, while the "narrow tailoring" requirement does not compel a library to use the least restrictive means to protect library use, there may be less restrictive options to a blanket exclusion of wheeled devices from the library. For example, in this case, the Library allows for wheeled devices "in designated areas." If libraries have a relatively safe place available to allow people to store their carts, it would impose a substantially lower burden on individuals seeking to bring wheeled devices into the Library. Such an accommodation may reduce any concern that the law is "substantially broader than necessary" to accomplish the library's legitimate goal. <u>McCullen</u>, 571 F.3d at 178.

B.   <u>Equal Protection Claim</u>

The Equal Protection Clause of the Fourteenth Amendment generally requires that the government treat similarly situated individuals similarly.   <u>See</u> <u>Aponte-Ramos v. Alvarez-Rubio</u>, 783 F.3d 905, 908 (1st Cir. 2015).   "In order to prove an Equal Protection violation, [Lu] must establish that, compared with other similarly situated individuals, [he was] 'selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"   <u>Id.</u> (quoting <u>Marrero-Gutierrez v. Molina</u>, 491 F.3d 1, 9 (1st Cir. 2007)).

Whether an individual is "similarly situated" for equal protection purposes is a fact-intensive question that "is not always susceptible to precise demarcation."   <u>Id.</u> at 909 (quoting <u>Marrero-Gutierrez</u>, 491 F.3d at 9).   "[T]he test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result."   <u>Id.</u> (quoting <u>Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.</u>, 246 F.3d 1, 8 (1st Cir.2001)).

Lu alleges that his exclusion from the Library violated his equal protection rights.  However, Lu has not "identif[ied] and relate[d] specific instances where persons situated similarly in all relevant aspects were treated different, instances which have the capacity to demonstrate that [Lu was] singled . . . out for unlawful oppression." Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995) (internal quotation marks omitted) (quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989)).  The only example he provides is a homeless person who was excluded from the Library with a shopping cart, but then admitted when he transferred the cart's contents to a suitcase. See Verified Compl. ¶7(e).  He does not explain what types of items this person put in his suitcase or how those items smelled.  As explained earlier, Lu was excluded because Hulme determined that the contents of his cart emitted a strong foul odor.  Because Lu has not shown any similarly situated individuals who were allowed into the Library, summary judgment is appropriate on his equal protection claim.  See Aponte-Ramos, 783 F.3d at 910.

Liberally construing Lu's complaint, see Erickson, 551 U.S. at 94, the court finds that Lu has also asserted a claim that the Library has selectively excluded homeless people as a class. See Verified Complaint ¶9.  He cites a newspaper article where

42

several members of the public, but not Library employees or the defendants, expressed concern over the use that homeless people were making of the Library.  See Verified Compl. ¶5 (citing Kahn, Free to All, supra).  However, Lu has not provided any evidence that the Library has disproportionately excluded the homeless.  Lu has also not provided any evidence that the Trustees adopted the Library Policy with intent to discriminate against the homeless.  Therefore, any disparate impact claim fails as a matter of law.  See Washington v. Davis, 426 U.S. 229, 239 (1976) (equal protection violation requires discriminatory purpose as well as discriminatory impact); Soto v. Flores, 103 F.3d 1056, 1067 (1st Cir. 1997) (same).

In view of the foregoing, the court is granting summary judgment for the defendants' on Lu's equal protection claims.

C.  Procedural Due Process Claim

"To establish a procedural due process violation, the plaintiff 'must identify a protected liberty or property interest and allege that defendants, acting under color of state law, deprived him of that interest without constitutionally adequate process.'"  Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011) (quoting Apponte-Torres v. Univ. of P.R., 445 F.3d 50, 56 (1st Cir. 2006)).  The basic guarantee of procedural due process is that the person whose liberty is

43

infringed receive notice of the intended deprivation and an opportunity to be heard at a meaningful time and in a meaningful manner. Id. "No rigid taxonomy exists for evaluating the adequacy of state procedures in a given case; rather, 'due process is flexible and calls for such procedural protections as the particular situation demands.'" Id. (quoting Morrisey v. Brewer, 408 U.S. 471, 481 (1972)).

In analyzing the First Amendment claim, the court explained that, defendants' refusal to allow Lu into the Library with his cart and its contents substantially burdened Lu's exercise of his First Amendment rights. For present purposes, the court assumes that the decision constituted a deprivation of liberty within the meaning of the Due Process Clause.

However, the defendants provided Lu with constitutionally adequate procedural protections in excluding him from the Library. The male security guard gave Lu notice that he would not be permitted into the Library with his cart and its contents. See Lu Depo. at 19. Lu was told that he could leave the cart outside and enter the Library. Id. Lu asked to speak to the guards' supervisor, Hulme. Id. at 20. Hulme came and listened to Lu for several minutes, and explained to him that he could not bring his possessions into the Library. Verified Complaint ¶7(e). Lu was given an opportunity to present his

44

view.  Id.  He was then again informed that he could not bring
the cart and its contents into the Library.  Id.  Hulme also
suggested two ways that he could enter the Library: he could
leave his cart outside, or he could find a more enclosed
container for his possessions, like a suitcase.  Id.  Lu was not
suspended from the Library or told not to return in the future.
See Lu Depo. at 35.  However, if he had such received such a
severe sanction, the Library Policy would have afforded him the
opportunity to "appeal[] in writing to the Director of Public
Services."  See Library Policy.

Lu was given notice, an opportunity to be heard, and an
explanation of the reasons he could not enter the Library.  In
the "particular situation" of regulating library admissions,
Mathews v. Eldridge, 424 U.S. 319, 334 (1976), no more
procedural protections are required.  See Neinast, 346 F.3d at
597-98.

D.  Massachusetts Civil Rights Act Claim

The MCRA, M.G.L. c. 12, §11I, provides that "any person
whose exercise or enjoyment of rights secured by the
constitution or laws of the United States, or of rights secured
by the constitution or laws of the commonwealth, has been
interfered with, or attempted to be interfered with, as
described in Section 11H may institute and prosecute in his own

45

name and on his own behalf a civil action for injunctive and
other appropriate equitable relief as provided for in said
section, including the award of compensatory money damages."
Mass. Gen. Laws c. 12, §11H.  The MCRA provides under state law
a remedy that is coextensive with 42 U.S.C. §1983.  See Farrah
v. Gondella, 725 F. Supp. 2d 238, 247 (D. Mass. 2010).  The Act
provides a right of action to any person whose exercise or
enjoyment of rights secured by federal or state constitution or
laws has been interfered with by threats, intimidation, or
coercion.  See Goddard v. Kelley, 629 F. Supp. 2d 115, 128 (D.
Mass. 2009); Bally v. Northeastern Univ., 403 Mass. 713, 717,
532 N.E. 2d 49 (1989).

   "To prevail under the Massachusetts Civil Rights Act
(MCRA), plaintiffs must prove that '(1) their exercise or
enjoyment of rights secured by the United States or the
Commonwealth of Massachusetts (2) has been interfered with, or
attempted to be interfered with, and (3) that the interference
or attempted interference was by threats, intimidation or
coercion.'" Davis v. Rennie, 264 F.3d 86, 111 (1st Cir. 2001)
(quoting Swanset Dev. Corp. v. City of Taunton,423 Mass. 390,
395, 668 N.E. 2d 333 (1996)).  "[T]he MCRA contemplates a two-
part sequence: (1) the defendant threatens, intimidates or
coerces the plaintiff in order to (2) cause the plaintiff to

give up something that the plaintiff has the constitutional right to do. Thus, for example, the statute would apply where a defendant (1) threatened to beat up the plaintiff if (2) the plaintiff exercised the right to vote." Goddard, 629 F. Supp. 2d at 128.

For the reasons explained previously, Lu has not shown that his federal constitutional rights were interfered with when he was denied access to the Library on June 13, 2012. See Titus v. Town of Nantucket, 840 F. Supp. 2d 404, 416 (D. Mass. 2011) ("The MCRA is coextensive with 42 U.S.C. §1983, except that the Federal statute requires State action whereas its State counterpart does not, and the derogation of secured rights must occur by threats, intimidation, or coercion.") (quoting Sietins v Joseph, 238 F. Supp. 2d 366, 377-78 (D. Mass. 2003)). He has also not pointed to any state statutory or constitutional right entitling him to bring his cart and its contents into the Library. Therefore, the court is granting summary judgment on Lu's MCRA claim.

VI.  CONTEMPT MOTION

Lu alleges that defense counsel forged the Library Policy for the purposes of this litigation. He requests an evidentiary hearing in order to determine whether defense counsel should be held in civil contempt for the alleged hearing. The defendants

47

oppose the contempt motion, explaining that the Library Policy has been in effect since March 2004.

A party has a right to an evidentiary hearing in a civil contempt proceeding only if, and to the extent that, genuine issues of material fact exist. See Morales-Feliciano v. Parole Bd., 887 F.2d 1, 6-7 (1st Cir. 1989). Lu's claims regarding forgery are conclusory. He has not provided any factual allegations or evidence that create a material factual dispute as to whether defense counsel forged the Library Policy. Accordingly, the Motion for a Civil Contempt Proceeding is being denied without a hearing.

VII.  ORDER

In view of the foregoing, it is hereby ORDERED that:

1.  The Defendants' Motion for Summary Judgment (Docket No. 63) is ALLOWED.

2.  Plaintiff's Motion for a Civil Contempt Proceeding (Docket No. 67) is DENIED.

/s/ Mark L. Wolf
UNITED STATES DISTRICT JUDGE